UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

MIREYA D'ANGELO,

                Plaintiff,

- against -

HSBC BANK USA, N.A., HSBC USA INC.,

                Defendants.

-------------------------------------------------------------x

06 CV 1619

Civ.

JUDGE CROTTY

ECF CASE

COMPLAINT

PLAINTIFF DEMANDS TRIAL
BY JURY IN THIS ACTION

RECEIVED MAR 01 2006 U.S.D.C. S.D. N.Y. CASHIERS

Plaintiff Mireya D'Angelo ("plaintiff" or "D'Angelo"), by her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complaining of defendants HSBC Bank USA, N.A. and HSBC USA Inc. (collectively "HSBC" or "defendants") alleges as follows:

### NATURE OF THE ACTION

1.      This action is brought to remedy discrimination on the basis of race in the terms, conditions and privileges of employment in violation of 42 U.S.C. § 1981 ("Section 1981"); the New York State Human Rights Law, Executive Law § 290 et seq. ("Human Rights Law"); and the Administrative Code of the City of New York § 8-101 et seq. ("City Law"), and to remedy defendants' retaliation against plaintiff because of her opposition to unlawful discrimination on the basis of her race in violation of Section 1981, the Human Rights Law, and the City Law. This action is also brought to remedy defamation under New York State common law.

235299 v2

2. Injunctive and declaratory relief, recovery of benefits, damages, and other appropriate legal and equitable relief are sought pursuant to Section 1981, the Human Rights Law § 297(9), the City Law §§ 8-502(a) and (f), and New York State common law.

## JURISDICTION AND VENUE

3. Plaintiff D'Angelo is a woman of Hispanic ethnicity and a resident of New York City.

4. Defendant HSBC USA Inc. is headquartered in New York City and is a holding corporation for defendant HSBC Bank USA, N.A., a Delaware corporation with offices in New York City.

5. Jurisdiction of this Court with respect to the Section 1981 claim is proper under 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over plaintiff's Human Rights Law, City Law, and New York State common law claims which derive from the same facts and circumstances as her Section 1981 claim.

6. Pursuant to § 8-502(c) of the City Law, copies of this Complaint were served upon the New York City Commission on Human Rights and the Corporation Counsel of New York City before the Complaint was filed.

## FACTUAL ALLEGATIONS

7. Plaintiff is an attorney who received a bachelors degree from Williams College in 1985 and a law degree from Cardozo School of Law in 1991.

8. Plaintiff spent her first eleven years after law school in public service. From 1991 until 1998, plaintiff worked as an Assistant District Attorney for New York County.

For six of these years, D'Angelo worked in the Financial Investigation Unit of the District Attorney's Office.

9. In 1998, D'Angelo became Investigative Counsel for the New York State Banking Department ("Banking Department"). In this position she was one of two attorneys in the Banking Department who prepared cases to be prosecuted against institutions charged with crimes such as the falsification of records or larceny.

10. In 2000, D'Angelo was appointed by Governor Pataki to work full time for the Moreland Act Commission that was charged with responsibility for reviewing construction contracts for the New York City Schools. That commission was created because of allegations of corruption that had plagued such contracts in the past.

11. In 2001, Governor Pataki appointed D'Angelo to the position of Investigative Counsel to the New York/New Jersey High Intensity Drug Task Force/High Intensity Financial Crimes Area. In this position she worked with the United States Department of Justice, the United States Treasury Department, and state and local law enforcement agencies and regulators in the prosecution of drug cartels and money laundering. D'Angelo's work focused on tracking money generated by the drug cartels and investigating financial crimes committed by the cartels. D'Angelo remained in this position until April 2002.

12. In April 2002, D'Angelo accepted a position as Compliance Manager for International Private Banking at HSBC with the title of First Vice President. Private banking refers to services that banks provide to very wealthy individuals. In her work in HSBC's Compliance Office, plaintiff was responsible for ensuring, among other things, that the wealth of

individuals using HSBC's private banking services came from legitimate sources, and for ensuring that HSBC would not be used to "launder" money derived from criminal activities.

13. D'Angelo excelled in her position as Compliance Manager, and in 2003 was appointed to the Top Fifty Program of HSBC's Private Bank, which recognized "high potential performers" in the Private Bank. In 2003 D'Angelo was also promoted to be Head of Anti-Money Laundering Compliance for Private Banking for the Americas, and was promoted to the title of Senior Vice President.

14. In the fall of 2003, HSBC hired Terese Pesce ("Pesce"), a white woman as Director of Anti-Money Laundering for HSBC Bank USA, N.A.

15. From the time that she became acquainted with D'Angelo, Pesce displayed bias against Hispanics, and against D'Angelo in particular. Pesce held D'Angelo to a higher standard than her white colleagues, criticized D'Angelo unjustly, and treated D'Angelo in a hostile and condescending manner. Pesce refused to credit D'Angelo's experience or opinions, unless those were confirmed by one of D'Angelo's white colleagues.

16. Pesce did not meet with D'Angelo until the first half of 2004. In that meeting, which was attended by Denise Reilly ("Reilly"), an HSBC Chief Operating Officer for Compliance, Pesce falsely accused D'Angelo of opening client accounts without Pesce's approval. Pesce withdrew this accusation only after Reilly interceded on D'Angelo's behalf, explaining HSBC protocol, and why Pesce was mistaken.

17. From April 2004 through June 2004, D'Angelo consulted several senior HSBC executives for their advice and assistance in working with Pesce. D'Angelo told these executives that Pesce was creating an uncomfortable and hostile work environment. The

235299 v2

executives that D'Angelo sought guidance from included Camillus Hughes ("Hughes"), who was then D'Angelo's supervisor and Head of Private Banking Compliance. These individuals told D'Angelo that she should continue to do her job and to make sure that Pesce was informed of the work that D'Angelo was performing, which D'Angelo did.

18. In July 2004, Hughes informed D'Angelo that she was going to be promoted to Director of Anti-Money Laundering for the Private Bank in the Americas and that she would report to Pesce in that position. When D'Angelo protested that she did not feel comfortable working for a woman who had treated her in a condescending and hostile manner, Hughes admitted that Pesce did not seem to like D'Angelo, but that the reorganization would be going forward, and there was nothing that could be done for D'Angelo.

19. After meeting with Hughes, D'Angelo had a meeting with Pesce about D'Angelo's new position. Pesce told D'Angelo that someone else had recommended D'Angelo for the position. During the brief meeting Pesce also expressed concerns about the high risk nature of investments by Hispanic clients, given that "most of their money comes from drugs."

20. On July 22, 2004, D'Angelo sent an e-mail to Hughes and several other HSBC executives. In this e-mail D'Angelo expressed her concern at being assigned to work for Pesce. D'Angelo further stated that she believed that reporting to Pesce would hurt her career at HSBC. Hughes met with D'Angelo after he received her e-mail and told her that he was concerned that she had sent such an e-mail.

21. In September 2004, D'Angelo saw an organizational chart that reflected that she was not reporting to Pesce, but rather to Reilly, who held a lower position than Pesce. When D'Angelo asked Pesce about this change, Pesce told D'Angelo that she had misunderstood

their conversations, and that D'Angelo would be reporting to Reilly rather than to her. Pesce told D'Angelo that it would not be fair to other employees if D'Angelo were permitted to report to her. Pesce said that even if the organizational chart was wrong, it could not be corrected because the chart had already been distributed. When D'Angelo approached both Janet Burak ("Burak"), General Counsel for HSBC, and Hughes about this issue, both thought that it was strange, because both knew that D'Angelo was supposed to report to Pesce. D'Angelo then called David Bagley ("Bagley") Head of Compliance for HSBC Group World-Wide, who confirmed that D'Angelo reported to Pesce. Later that day, Pesce called D'Angelo and confirmed that D'Angelo reported to her.

22. In the fall/winter of 2004, Pesce told D'Angelo that D'Angelo should go to HSBC's Miami office to review its anti-money laundering process. At the time the anti-money laundering process in Miami was being run by Clara Hurtado ("Hurtado"), a Hispanic woman who reported to D'Angelo. Pesce said that D'Angelo needed to change the entire anti-money laundering process. Pesce said she considered Hurtado to be "weak" and that Hurtado needed to be managed. Pesce also told D'Angelo that she was concerned about the anti-money laundering process in Miami because Manuel Diaz ("Diaz"), a Hispanic man who was the Chief Executive Officer of the Miami office, was "running his own show" and that the Miami office was "a little Latin America."

23. D'Angelo told Pesce that she disagreed strongly with Pesce's characterization of the Miami office. D'Angelo explained that although the Miami office, like other offices, might need improvement in some areas, Hurtado was doing a good job and had a strong background in International Private Banking; D'Angelo also stated that Diaz's office was

235299 v2

6

performing well. After the meeting D'Angelo told Hughes about the meeting and her concern about Pesce's comment that the Miami office was "a little Latin America." Hughes told D'Angelo that he would speak with Pesce about the comment.

24. Pesce held regular meetings with her direct reports during which client issues would be discussed. During these meetings, one of Pesce's supervisees, who was responsible for anti-money laundering efforts in other areas of HSBC, made numerous biased comments regarding Hispanic clients. During one such meeting, that employee stated, without basis, that the wealth of a Hispanic client came from coca, not the client's coffee farm. Although that employee reported to Pesce, she did nothing to reprimand him, but rather smiled when he made that biased comment.

25. Pesce often made biased comments about Hispanic clients. During a meeting in the second half of 2004, a Hispanic client was discussed. Pesce became hostile as she questioned transactions that had occurred with respect to the account. A Hispanic executive in the International Private Bank in New York attempted to explain the nature of Hispanic clients' banking behavior. Pesce responded to this executive by stating that Hispanic clients were very high risk. Pesce elaborated that while one could usually feel comfortable with the wealth of Middle Eastern clients, knowing that it came from oil, the majority of the wealth from Hispanic clients came from drugs. After the meeting D'Angelo reported Pesce's statements to Hughes.

26. Once when the issue of a fine imposed by the United States Attorney's Office on a Hispanic client was discussed, Pesce stated that the fine was, "of course" due to drug money laundering -- although this was not the case, and there was no reason to believe that drugs were related to the fine.

27. In another meeting, a high-net worth Hispanic prospective client was discussed. Although D'Angelo had done extensive due diligence regarding the potential client, who met the qualification requirements and presented a good business opportunity for HSBC, Pesce refused to permit the potential client to open an account. Pesce stated that the account should not be opened because the potential client had acquired his money from extreme corruption that was "typical" of Hispanic wealth. D'Angelo pointed out that there was no evidence that the individual was involved in any sort of corruption. Eventually other high level HSBC officials authorized opening the account.

28. When new accounts for embassy clients were discussed, Pesce often stereotyped the account based on the race and/or ethnicity of the individual requesting the account. Thus, Pesce stated that clients from Middle Eastern embassies should be turned away since these individuals might have connections with Al Qaeda. Pesce believed, however, that clients from European embassies were "safe" clients.

29. In April 2005, D'Angelo told Pesce that she had been chosen to attend a meeting in Geneva in June 2005 of the fifty top employees of the Private Bank. D'Angelo told Pesce that during the trip she would visit the HSBC Paris office to resolve an ongoing problem with opening United States accounts in France, and that she would visit the HSBC Monaco office to address issues specific to Monaco accounts. Pesce told D'Angelo that it was fine to make arrangements for those trips.

30. In June 2005, D'Angelo reminded Pesce that she would be going to Europe, and reminded Pesce of the offices that D'Angelo would visit. Pesce told D'Angelo that she remembered the trip.

235299 v2

31. During the June 2005 trip, D'Angelo received a number of calls from her direct reports in the United States, stating that Pesce was asking where D'Angelo was; who had approved D'Angelo's trip; and who was paying for the trip. D'Angelo's direct reports gave D'Angelo's itinerary to Pesce and encouraged Pesce to contact D'Angelo directly. Despite this, D'Angelo never received any calls or e-mails from Pesce while she was in Europe.

32. Pesce never spoke with D'Angelo after she returned from Europe. When D'Angelo attempted to meet with Pesce, Pesce cancelled previously scheduled meetings and did not reschedule them.

33. On July 25, 2005, HSBC Human Resources representatives called D'Angelo into a meeting. Javier Evans ("Evans"), a HSBC Human Resources Representative, and Sixto Santiago ("Santiago"), an Investigator from the Corporate Security Office told D'Angelo that she was being placed on administrative leave because HSBC's Auditing Department was conducting a routine and confidential review of her time and expense reports. When D'Angelo asked if she was being fired, Evans and Santiago told her that she was not. D'Angelo asked whether Pesce was involved in the decision to place D'Angelo on administrative leave and was told that she was not.

34. Later that afternoon D'Angelo received calls from two of her direct reports. The employees told D'Angelo that Pesce had told D'Angelo's team that D'Angelo had been placed on administrative leave because of business, not personal issues.

35. D'Angelo then received word from other HSBC employees that they had been told that she had been fired. These employees also told D'Angelo that she was no longer listed on the HSBC computer directory, which happens only when an HSBC employee is fired.

36. At a meeting on July 26, 2005, Pesce told some of her supervisees that if anyone asked about D'Angelo, the person should be told that D'Angelo was on administrative leave because of business reasons.

37. On August 1, 2005, D'Angelo learned that employees in HSBC's New York office were being told that she had been fired for money laundering. D'Angelo was told that individuals in HSBC's Miami office were being told that she had been arrested.

38. On August 11, 2005, D'Angelo was fired at a meeting called by Marcella Cowal ("Cowal"), who was the then Head of Human Resources for the Compliance and Legal departments, and Bruce Brady ("Brady"), an Investigator from the Corporate Security Office. Pesce was not present during this meeting.

39. During the meeting, Cowal and Brady told D'Angelo that she was being fired for time and expense violations. Although D'Angelo asked Cowal and Brady for specific examples of the alleged violations, Cowal and Brady said that they did not have the full report in front of them and could not give her specific examples. D'Angelo noted that HSBC's policy manual requires that employees be given notice by their managers of such performance issues and time to improve. Cowal told D'Angelo that Pesce had brought the situation to the attention of the Human Resources Department, and that Pesce was reviewing further the expenses that D'Angelo had previously submitted to her.

40. During the year that D'Angelo reported to Pesce, Pesce never discussed any issue with D'Angelo's time or expense reports and had approved all the reports presented to her. Similarly, no other HSBC official had ever raised any question with respect to D'Angelo's time or expense reports prior to July 25, 2005.

41. After D'Angelo was fired, Pesce replaced her with Susan Hogarth, a woman who is not Hispanic and had formerly reported to D'Angelo.

42. Currently no Hispanic employees report to Pesce. Although Pesce hired a number of individuals when she became Director of Anti-Money Laundering for the United States Bank, Pesce has not hired any Hispanic individuals.

43. After she was fired, D'Angelo asked Burak to review the circumstances of her dismissal, and the results of the audit. After several weeks, D'Angelo received documentation of some of her alleged violations of HSBC's time and expense policy. D'Angelo reviewed each of the examples, and provided explanations and/or documentation refuting each example. On September 16, 2005, D'Angelo submitted this evidence to HSBC, asking that HSBC reconsider its dismissal of her and again informing HSBC that she believed that Pesce had discriminated against her because she was Hispanic.

44. Burak called D'Angelo on September 29, 2005 to tell D'Angelo that although Burak knew that D'Angelo had not done anything that was either intentional or criminal, HSBC would not rehire her.

## FIRST CLAIM: SECTION 1981 - DISCRIMINATION

45. Plaintiff repeats and realleges ¶¶ 1-44 of this Complaint as if set forth herein.

46. By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of her race in violation of Section 1981.

47. Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

235299 v2

48. As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## SECOND CLAIM: SECTION 1981 - RETALIATION

49. Plaintiff repeats and realleges ¶¶ 1-48 of this Complaint as if set forth fully herein.

50. By the acts and practices described above, defendants retaliated against plaintiff for her opposition to unlawful employment practices, in violation of Section 1981.

51. Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

52. As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## THIRD CLAIM: HUMAN RIGHTS LAW - DISCRIMINATION

53. Plaintiff repeats and realleges ¶¶ 1-52 of this Complaint as if set forth herein.

54. By the acts and practices described above, defendants have discriminated against plaintiff on the basis of her race in violation of the Human Rights Law.

55. As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## FOURTH CLAIM: HUMAN RIGHTS LAW - RETALIATION

56. Plaintiff repeats and realleges ¶¶ 1-55 of this Complaint as if set forth fully herein.

57. By the acts and practices described above, defendants retaliated against plaintiff for her opposition to unlawful employment practices, in violation of the Human Rights Law.

58. As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## FIFTH CLAIM: CITY LAW - DISCRIMINATION

59. Plaintiff repeats and realleges ¶¶ 1-58 of this Complaint as if set forth herein.

60. By the acts and practices described above, defendants have discriminated against plaintiff in the terms and conditions of her employment on the basis of her race in violation of the City Law.

61. Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

62. As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## SIXTH CLAIM: CITY LAW - RETALIATION

63. Plaintiff repeats and realleges ¶¶ 1-62 of this Complaint as if set forth herein.

64. By the acts and practices described above, defendants retaliated against plaintiff for her opposition to unlawful employment practices, in violation of the City Law.

65. Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

66. As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

### SEVENTH CLAIM: NEW YORK STATE COMMON LAW - DEFAMATION

67. Plaintiff repeats and realleges ¶¶ 1-66 of this Complaint as if set forth fully herein.

68. HSBC communicated the false message to HSBC employees and others that plaintiff had engaged in unethical behavior, illegal behavior, and/or conduct of a crime involving moral turpitude, imputing dishonesty to her and injuring or prejudicing plaintiff in her profession, trade, or business.

69. The defamatory communications that HSBC made to HSBC employees and others that plaintiff had engaged in unethical behavior, illegal behavior, and/or conduct of a crime involving moral turpitude, would be reasonably understood to refer to plaintiff and to mean that plaintiff had committed a crime involving moral turpitude and/or that plaintiff was dishonest in her profession, trade or business.

70. HSBC's conduct against D'Angelo was willful and malicious.

71. The communications made by HSBC that plaintiff had engaged in unethical behavior, illegal behavior and/or conduct of a crime involving moral turpitude, were made by

235299 v2

HSBC employees or agents while they were acting within the scope of their authority as agents of HSBC. HSBC is therefore liable for these statements.

72. As a result of HSBC's defamation of D'Angelo, D'Angelo has suffered substantial monetary damages, including lost income and benefits, and will continue to suffer such damages until and unless this Court grants relief.

73. As a result of HSBC's defamation of D'Angelo, D'Angelo has suffered severe emotional distress and humiliation as well as physical symptoms and will continue to suffer such damages until and unless this Court grants relief.

74. D'Angelo is now suffering irreparable injury and monetary damage from HSBC's defamatory communications and will continue to do so unless and until the Court grants relief.

PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

(a) declaring the acts and practices complained of herein are in violation of Section 1981, the Human Rights Law, the City Law, and New York common law;

(b) enjoining and permanently restraining these violations of Section 1981, the Human Rights Law, the City Law, and New York common law;

(c) directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendants to reinstate plaintiff to the position she would have occupied but for defendants' unlawful conduct and making her whole for all earnings she would

235299 v2

have received but for defendants' unlawful conduct, including, but not limited to, wages, pension, bonuses, and other lost benefits;

(e) directing defendants to pay an additional amount to compensate plaintiff for the emotional distress defendants' unlawful conduct has caused plaintiff;

(f) directing defendants to pay plaintiff an additional amount as punitive damages;

(g) awarding plaintiff such interest as is allowed by law;

(h) awarding plaintiff reasonable attorney's fees and costs; and

(i) granting such other and further relief as this Court deems necessary and proper.

DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
       March 1, 2006

                                                VLADECK, WALDMAN, ELIAS
                                                     & ENGELHARD, P.C.

By: *[signature]*
Debra L. Raskin (DR 5431)
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300

235299 v2